Good morning. Good morning. Would you like to reserve any time? I would. I would like to reserve four minutes, please. May it please the court, I'm Cindy Victor on behalf of the appellants. All right, you may proceed. Thank you. This case is before you on an appeal from a partial grant of summary judgment and a denial of a motion for contempt. With all due respect to the district court, we believe that this court should reverse that ruling first as to the issue of First Amendment. We're here on more than a contempt aren't we? You're appealing a summary judgment. Yes, correct. Okay. We prevailed on the FOIA claim and we lost on the constitutional torts claims. So we're here on the constitutional torts claims. The other part was not cross appealed. Excuse me. As to the First Amendment claim, the record was clear that my clients engaged in constitutionally protected speech. That this is not a matter that just happened in 1995 and didn't happen thereafter, which is what the district court found. But rather, that there were continued to be interactions between my client and the prime person on behalf of the village, Mr. Dulecki, throughout the years. This is a small village. It's got 1,700 people in it. And as we pointed out in the briefs, the village sits in the township of Armada. And Mr. Padereck is the supervisor of the township of Armada. So with the tensions between that position and the village, there continued to be, every time he exercised constitutionally protected speech, it created problems for him. And we would direct the court to the letter that was sent to him in November of 2011, in which he was told that if you continue to speak critically of people in the government, there will be consequences. That was the language. There will be consequences. And Mr. Padereck didn't stop speaking, and there were consequences. Because within a few months after that, not only did he lose his position as head of the Downtown Development Authority, but also then there began the pattern of the tickets, and then the issue with the special land use, and all of the rest of it. Now, as we point out in our brief, there's case law from other circuits. This circuit has never addressed it, but there's case law from other circuits that say that even a series of minor incidents over a long period of time can come to a point where they create a critical mass to create the retaliation. And that's what we say happened here. Because it just continued to ferment. As Mr. DeLucci says in his deposition, he disliked my client. He had personal animus against him, and he admitted in his deposition, and we have the record citations in our brief, that he took different action toward appellants in this case than he did other businesses because he didn't like appellants, and he liked the other businesses. And he comes out and he says that. And that this continued over the years. So it isn't a situation where they're pointing to something and it all disappeared. You have the person that we're saying is the protagonist of the animosity saying, yeah, I had that animosity, and I continued that animosity, and it continued to grow all the time, and it kept it with me. So this isn't a situation where he said, oh, something happened 20 years ago, and I blew it off, and it didn't matter. That's not what happened. His testimony says 180 degrees different. He also points out that when you look at the actions that were taken, you can see that that 1995 incident still meant something to Mr. DeLucci. And how do we know that? Because what kept being insisted over and over and over again was that you had to come in front of Planning Commission for a new special land use. And that's contrary to Michigan law, and we briefed that and so forth. Which 1995 incident are you referring to? I'm referring to the, in 1995, Mr. Padereck went before the board to get a special land use for the first building as opposed to the second building. And he went before them, and the village imposed a number of conditions that he then appealed. At that time, the law allowed you to go to the village council and get, they were like the voice of the court of last resort. So the village council changed what happened, and the records, the minutes reflect that Mr. DeLucci was furious at this. So Mr. DeLucci was upset because your client was able to obtain the special use approval? Well, without the conditions that he kind of went over Mr. DeLucci's head and did so forth. So what's important about that? You go to 2013, and the law in Michigan changed. The Planning and Zoning Enabling Act today, and in 2013, says the Planning Commission is the voice of the court of last resort. So had Mr. Padereck not consulted council and didn't know that a special land use ran with the land, which everybody's admitted happens, and that the special land use continued to exist for second building, if he had gone in front of them on an application for a new special land use, which is what the village was telling him he had to do, and they filed suit in circuit court saying he didn't have a special land use. When he had one, it was recorded, it was recorded in the minutes, recorded in the Register of Deeds. When he had that special land use, had he gone in front of them to request a new one, that means his old one disappears, and Mr. DeLucci, who is still head of the Planning Commission 18 years later, he could set whatever he wanted to set for conditions. And this time, Mr. Padereck couldn't go to the village council because the law had changed. So that's what's so important here about why they tried, and when he wouldn't do that, they began issuing tickets literally every day, and we not only cite the tickets, and they're all part of the record, but also the testimony of Code Enforcement Officer Mr. Lemieux, who said, I was told by Mr. DeLucci to issue tickets every day, and he did, and he had never done anything like that in the past. In his lifetime as Code Enforcement Officer, and he had been there a long time, at most he issued a ticket or two, and you're talking well in excess of 30 tickets, I mean just day after day after day after day after day, they would come in in lotters with three or four at a time, and for not having a special land use, which he had, and always did have. And so all of these actions, the filing of the circuit court lawsuit, the district court tickets, limiting his hours, removing him from the DDA, refusing to inspect so that he could get, they're claiming he needed a certificate of occupancy. Mr. DeLucci and Mr. Lemieux, where does it say you have to have a new certificate of occupancy? Where's this zoning regulation that you have to go in front of the Planning Commission to ask to start a new business? Where is it? And nobody could point to that. It didn't exist. So you have all of the elements to meet the First Amendment claim here, and you have the annexes and timing, you have, if you even want to drop off the 1995 issue, but Mr. DeLucci himself testified that that started his animosity toward Mr. Paderak and appellants, you've got the letter in November of 2011 where they say, we don't like you being critical of people in the government, so if you don't stop doing so there will be consequences. What more could be a threat, a retaliatory action for exercising your First Amendment rights than issuing that letter, that letter from the village to appellants? Under equal protection, we believe the district court erred on that matter because the record is replete with differing tests, differing treatment. I've been doing this for 35 years and I still am so full of respect for this court I get nervous at times, so I apologize. It is filled with differing treatment of both appellants versus everybody else. And I know the brief goes on in length both in the Statement of Facts and pages 30 to 32 of the argument itself where it lists all of the businesses in the village who were allowed to operate, who got certificates of occupancy just by paying a fee, who got the certificates of occupancy before they were inspected, one of which has gone through five different owners, a pizza place, a pizzeria that has no fire suppression system, and yet it's allowed to operate as a pizzeria. Were any of the businesses, though, engaged in light industrial activities? They were not engaged in light industrial, but they were engaged in things that were more dangerous than just a machine. These are not machines. When we talk about light, we really mean light. This isn't a place where you're running heavy industrial. It truly is light industrial. And while the district court said that the zoning, they weren't properly zoned, they were. A special land use changes the zoning, and these buildings had been zoned, both the first building and the second building, for light industrial use since 1995. Ms. Victor, you don't dispute, however, that if this was the only light industrial business, then it should be subjected to, perhaps, special zoning. I don't disagree on the zoning, but I do disagree on the special requirements as to a certificate of occupancy, because the zoning ordinance, nor any statute, nor any village ordinance, requires that for light industrial versus anything else. It says, what they said is, all businesses, this was the defendant's argument was, no, everybody has to get a new CFO before they start a business. Okay, that's your argument in opposition to it. So then we came back and said, but that's not true. Look at your own records. Here's what your records show. Your records show that you gave out CFOs without inspections. That you did executive approval by Mr. DeLucky of a CFO without even going through applications or anything. That you allowed people to operate without site plans, without letters of intent, without the requirements that are there for approval. That you have several businesses in the village that have no certificate of occupancy, and you've never taken any enforcement action against them, nor have you tried to get them to get a certificate of occupancy. The only one that the evidence is that was required to do what my client was required to do is my client, and that's never been disputed. That's the only one who was required to do that, to go through that level of inspections, to have all these things. And that segues into, I know I'm out of time, that segues into the contempt issues. You're out of time unless you want to take some of your rebuttal time. No, I'll save that for rebuttal, but thank you. Thank you for your time this morning. Good morning, Your Honors. Karen Ford on behalf of the defendants' appellees. Good morning. Good morning. I'd like to, it's our position today that the district court properly granted summary judgment in favor of the defendants on the section 1983 claim. Because the plaintiffs cannot show a First Amendment retaliation claim, they cannot show equal protection violations, and they cannot show that their procedural or substantive due process guarantees were violated. There does seem to be a fair amount of evidence in the record that this business was treated terribly differently from a number of other businesses. And even some statements by Mr. DeLecky that would suggest that the city was acting arbitrarily or capriciously with respect to this one particular business. So I'm a little baffled by what was going on here. That's, Your Honor, I'm happy you addressed that. That's exactly where I was headwaying into after opposing counsel's argument. It's simply not true. If you look at the record and the exhibits attached to Plaintiff's Motion for Summary Judgment, I think they have 1, 2, 3, 4, 5, 6, 7, 8, or 8 exhibits pertaining to 8 different business entities within the village. All of those business entities applied for a COO. There's two different things here that seem to be getting intermingled. There's a COO, a Certificate of Occupancy, which is issued by the building inspector, inspects the property, makes sure it's up to code. There's also approval by the Planning Commission for a site plan for a new business, a new business. One was for a cake shop or something along those lines, or maybe for a special land use. In this case, we admit there was a special land use for the property acquired in 2013. Special land use is run with the land. It was the village's position that they needed to apply for a COO under the zoning ordinance because of the reoccupancy. They have not been treated differently than any other business. There's a situation where there was a portrait collection, a photo studio on Main Street. That shut down. A new photo studio took over. They had to apply for a new COO because of reoccupancy. There's a situation where there was a dollar store. The dollar store closed down. A new individual came and wanted to open a dollar store in the same premises. They had to apply for a new COO. These were in close proximity of time. How about the difference in the way that Plankton was treated vis-a-vis Larry's Automotive when they were ticketing for a storage violation? In that case, they simply had a discussion with the owner of Larry's. They didn't ticket him. In the context of DeLucky saying that he had a personality conflict with the Plankton, that Plankton was not one of his best friends and the Plankton should have known better because he was a supervisor, et cetera. Sure. I admit, the record shows these are not the best of friends. They're not friends at all, probably. DeLucky did say Mr. Paderak should have known better. DeLucky was not the one issuing the tickets. It's the building inspector. Mr. Lemieux testified he does not take any direction from Mr. DeLucky. It was his decision based on the zoning ordinances to issue the tickets. With respect to the outdoor storage issue that happened in 2012, the village sent two letters first to Mr. Paderak, one in March 2012 and one in April. The one in April said if the outdoor storage is not cleared up by the end of April 30, 2012, we will have to issue a citation. So he was provided, they didn't just go blindly one day and issue him a citation. They didn't do that to Larry's. I understand your point, but they didn't do that to Larry's. We're talking about they're treating two similarly situated businesses differently when he didn't have a personality conflict with Larry's owner, but he did have a personality conflict with Paderak. With respect to Larry's, the only documents in the record with respect to Larry's is Mr. DeLucky's testimony that he spoke to the owner of Larry's Automotive. In this case, a letter was sent to Mr. Paderak. Mr. Paderak didn't comply with it. Another letter was sent. He didn't comply. He didn't clean up the outdoor storage by April 30th. So on May 10th, a citation was issued. Yes, maybe a different route was taken. He didn't personally go talk to him, and I don't think that amounts to a constitutional deprivation of equal protection. Yeah, but Larry's didn't get a citation. He cleaned up the storage issue. I mean, there's nothing in the record one way or the other to that effect, just based on DeLucky's testimony. It wasn't an ongoing problem or in that time frame, and that's why he was treated. So he was spoken to, and Mr. Paderak, a letter was issued to him. That's the difference there. Larry's cleaned it up, and there's evidence in the record that Larry cleans this up? There's nothing in the record, from my recollection, with respect to Larry Automotive, other than Mr. DeLucky's testimony at his deposition where he just candidly said, Oh, you know, Mr. Paderak, he's the township supervisor, or the village supervisor. He knows the rules. I spoke to Larry's Automotive. A letter was sent to Mr. DeLucky. That's where, but even if that, so that is true. Based on DeLucky's testimony, that does not show that he was treated differently. He was still provided notice. He wasn't, no constitutional deprivation took place here. No procedural due process was, his procedural due process was not taken from him. He was given notice, and then he was given an opportunity to be heard. I would like to jump backwards to the First Amendment retaliation, because that seems to be really the heart of their position in the district court and here on appeal. And I want to put things in perspective. To establish a First Amendment retaliation claim, you have to show that there was some, that the individuals engaged in a protected conduct. They expressed their First Amendment rights. Plaintiffs contend that in 1995, they went to the Planning Commission, asked for certain variations to their special land use, which had already been approved in 1993. They wanted extra hours, another parking space. They wanted an extension of time to pave the parking lot. The Planning Commission denied that. That's true. They had the right to appeal to the Village Council. They did. The Village Council gave them all the relief they were looking for. Plaintiffs want to use that protected activity of appealing that to the Village Council to say that 17 years later, they were retaliated against because of that. There's nothing in the record from 1995 to November 2011 and April 2012 of any type of action taken by the Village of Armada or Ben Delucky against Paderak or his business. There's just simply nothing in the record. What was the date that the plaintiff was removed from the City Commission? The DDA? Yes. What was the date of that? The plaintiff was not removed from the DDA. The DDA was dissolved. Allegedly, your opponent, and we take things in light and most favorable to him at this stage, claims that that was done to target him. Was that actually true or correct? No. I don't know, but my question was what date did that occur? Sure. Was that 2004? The DDA was dissolved in February 2013. The letter was sent in November 2011, so it was more than a year, 14 months, 15 months, that the DDA was then dissolved. No action was taken after that letter to remove Mr. Paderak from that position. The whole DDA board was dissolved, and it was put under the Planning Commission. So there's nothing in the record to that, and it wasn't in close proximity. Who had the Planning Commission? Mr. Delucky does have the Planning Commission. Yes. I can't deny that that's true. There are some very unorthodox things, seemingly at least, that the City was doing. Some of these violations just seem to be, and tickets seem to be, fairly harassing and uncalled for, even down to giving the man a ticket for having a little portable barbecue there outside and $150, getting fined $150 per day until the court intervened. I mean, if the business was in such violation as to require being fined each and every day, it would seem that the City would be about the business of shutting him down instead of just slapping him with a $150 fine every day. There was some sort of ongoing and continuing dispute there, and whether it was badly motivated and not in good faith would be what you would expect the litigation to unravel. But that can't be addressed with the district court cutting off this case at the inception with this summary judgment. What do you say to all that? A couple of responses to your inquiry, Your Honor. First, to take a look, that plaintiff has never been deprived use of their property. They were never restricted from using their property, even though they did not have a COO. They were never restricted from access to this property. So there's no deprivation to that sense. With respect to issuing the CEOs for 25 days in a row, sure, that looks a little, I would admit, that looks excessive. It took 25 days, and then the city, or the village, I'm sorry, the village did file action in the state court, and the action was filed in the state court, and then PADERAX filed this action in the United States District Court. So we had the state court action with respect to the violation of not applying for a COO. All that the PADERAX had to do was apply for a COO for the reoccupancy, and it could have been issued. So the PADERAX did not comply with the zoning ordinances, and the city or the village took the action of issuing the citations, and then when that was not prompting Mr. PADERAX to comply and come into the office and apply for a COO, they issued the state court action. Where we are at today, the state court action was completely dismissed. He did not have to pay any of the fines. I'm having a little problem following this factually because you said they wouldn't apply for a COO, but I thought the record indicated that the only way the plaintiffs were able to get a COO was that the district court ordered the city to inspect the property and to issue this COO, so that it would seem the district court viewed the lack of that not because the plaintiffs didn't apply, but because the city didn't want to provide the COO. Your Honor, I would respectfully disagree to some extent there. On October 21st, the district court ordered the plaintiffs to apply for the building permits to apply for the COO. The district court then ordered, once that they took that action for the city, the district court actually ordered a neutral inspector to inspect the properties, and once the properties were inspected and any violations that were found, to then issue the COO. The district court did require the plaintiffs to comply with the zoning ordinances in its October 21st order, which was then amended October 25th just because of the building inspector issue, to first apply for the building permits to get a COO. That is consistent with our zoning ordinances that for reoccupancy. So the district court did not... Plaintiffs, they did apply for a COO. That's in the record. So that was not bypassed in this situation. So that was the whole point. We needed the documents. They needed to come into the village and apply for a COO to trigger the building inspector to inspect the property. In this case, the building inspector for the village was not able to inspect the property because we were in litigation and the district court ordered a neutral inspector, who then found 31 code violations, which the plaintiffs were required to correct, and then the COOs were issued for both levels of the building. I would just briefly... A plaintiff's counsel, I expect, is going to come up and talk about the contempt orders. I would just say... I have one question before we get to that. Did qualified immunity factor into the district court? Did you raise the qualifying immunity? Yes, and it's briefed in the appellate brief as well. We did raise it in the district court that Mr. DeLocke, he's only being sued in his individual capacity now, that he is entitled to qualified immunity. The district court didn't get that far because they found no constitutional protections. We maintain... or no constitutional violations. We maintain that there are no constitutional violations. If this court... If you decide that there are constitutional violations, what is your argument with respect to qualified immunity? I would maintain that Mr. DeLocke is entitled to qualified immunity. The plaintiffs have not shown that... Of course, we maintain that there's been no constitutional violation, but with the second parameter that they have not come forward for that and they have not shown that he should not be entitled to qualified immunity in his individual capacity. And that is fully... it's briefed in our appellate brief as well. And then I would like to just briefly... I will rely on my brief for the contempt issues. The district court did not... I just have one additional question with respect to the qualified immunity analysis. Would you agree that that does not have to be a case on point and set forth in Hope v. Pelzer in order to establish that there was a violation... it was a clearly established right that was violated? Yes, I agree with that. All right. Yes. And then for the... I'll rely on my brief for the contempt issues unless there's any questions from the court. Apparently not. Okay. And so we would respectfully ask this court to affirm the district court's ruling in all respects. Thank you, Your Honors. Hello again. With respect to the other businesses, the treatment, it wasn't just a few businesses. On page 19 and 20 of our primary brief, we point out the seven businesses that did not have CFOs and the numerous other businesses, many more than seven, that were operating... that were allowed to operate differently. So it's not just a few businesses. Your Honor, Judge Marbley, you're absolutely right on Larry's Automotive. It was completely treated differently, and they were very similar. In that case, too, where they said, well, Mr. DeLucky wasn't deciding Mr. Lemieux's actions, that's not true. The record says differently. Mr. Lemieux said in his... and that they didn't fail to clean it up, that's not true either. Mr. Lemieux testified that he issued... he was told to take some steel pipes off, first of all, April 16th, and he was directed by Mr. DeLucky to do that. So he immediately moved them. Then on May 1, Mr. DeLucky told Mr. Lemieux, go have him move his snowplow. So he moved the snowplow the same day. Both Mr. Lemieux said, Mr. DeLucky told me to do this. Then he said that that wasn't good enough. Mr. DeLucky then told him to issue violations for the outdoor barbecue, as you pointed out. And that began on May 10. And it's on docket 42, page ID 1168, and docket 29, page ID 86, that show where he said, Mr. DeLucky told me, Planning Commission told me, he didn't think it was a big deal. He considered it closed. But Mr. DeLucky told him, you go out there and write that ticket. So to say Mr. Lemieux is acting independently is 180 degrees contrary to what our record says. Now, with respect to the issue with the DDA, we've put forward why the DDA was dissolved, and it was because of Mr. Paderec. There was no evidence in the record below that it was dissolved for any other reason. And you're right, today Mr. DeLucky is the head of the DDA, not Mr. Paderec. That's now his duty as well as being head of Planning Commission. Also, this matters before our court today, and you have the motion for summary judgment. Correct. What genuine issues of material fact are in dispute that would defeat the motion for summary judgment? That with respect to the First Amendment issue, that there were actions that were taken that were retaliatory based on the exercise of First Amendment rights. With respect to the equal protection issue, that there was a genuine issue of material fact, that other businesses were treated more favorably than plaintiff because the village and Mr. DeLucky didn't like the plaintiffs, and they admitted that, and they admitted that there was differing treatment, and the record shows differing treatment. With respect to the substantive due process claim, whether there's a genuine issue of material fact as to whether the defendants acted arbitrary and capriciously, and how they dealt with plaintiff versus other people, and that they took away a property right contrary to sister council, they were not able to use their building. They were told they could not use their building until they got that C of O. The C of O was applied for. That's actually what drove us to the district court, federal district court, was that my client applied for the C of O in August of 2013 and was told by Mr. Lemieux, and it's in the record, we're not even going to consider your application until you come in and apply for a new special land use. Mr. Padereck submitted an application. Consultative council realized he didn't have to because it ran with the land, and so then he withdrew it, and they wouldn't act on his certificate of occupancy, and that's why we were in front of the court. We didn't just apply because the judge ordered us to. We were there because they wouldn't act on our application, and then all the other stuff. With respect to the procedural due process claim, it was a genuine issue of material fact as to whether or not putting Mr. Padereck on the agenda to take adverse action and prosecute him at a planning commission meeting without notice to him, without an opportunity to be heard, without the proper notice, all of which Mr. Delecky admitted happened. He did it intentionally. He even said in his deposition, I did it intentionally. I didn't want him there. I want to take this action against him without him, was a violation of procedural due process. So those would be the genuine issues of material fact. The genuine issues of material fact of which you allege the district judge was in error when he granted summary judgment when all of these material issues of genuine fact were in dispute. Yes, they were all in dispute. That's correct. So that's why we say that they should not have granted summary judgment because there was genuine disputes based on legitimate record evidence. We submitted a lot of record evidence, which has all been briefed in this case. So we were deprived of the use of our property. With respect to the state court action, that was not brought to get a certificate of occupancy. If the court looks at that state court action, you'll see in each and every paragraph, it says they were operating without a special land use, which sister counsel has admitted is not true. They had a special land use. If you look for the prayer of relief, it's to shut down the business until they apply for a special land use. There's nothing in the claim or the prayer of relief that says they don't have a certificate of occupancy. Asking the state court to order them to have a certificate of occupancy, it all relates. And, in fact, at his deposition, I said to Mr. Lemieux, when you read this, did they have a special land use? Yes, they did. When you read this, do you think there was grounds for this lawsuit? And he said, no, because it's only about a special land use. The code enforcement officer said there were no grounds for the lawsuit. When saying Mr. Padraic... I want to wrap up now since the lights have been on for a while. Right. With respect to the qualified immunity issue, if I can just address that very, very briefly. And I'll make it one sentence. Mr. DeLocke did know that he was depriving them of their constitutional rights because of that McKenna meeting, where he was told that a land use ran with the land. And he said at that meeting, and we attached that, the transcript of that, I don't agree, I don't like that, and that's not what I want. And he, knowing that and being instructed that that property had a special land use, he still took these actions. Thank you for your time this morning. All right. Thank you, and the case is submitted.